LAW OFFICES
BROENING OBERG WOODS & WILSON
PROFESSIONAL CORPORATION
2800 NORTH CENTRAL AVENUE, SUITE 1600
PHOENIX, ARIZONA 85004
(602) 271-7700

Robert T. Sullivan/Bar No. 022719
rts@bowwlaw.com
Jeremiah M. Sullivan (038569)
jms@bowwlaw.com
Minute Entries/Orders
cjg@bowwlaw.com
*Attorneys for Defendant Prospect
Airport Services, Inc.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Douglas Heir,<br><br>               Plaintiff,<br><br>vs.<br><br>American Airlines Group, Inc., a Delaware corporation doing business in Arizona, American Airlines, Inc., a Delaware corporation doing business in Arizona; Prospect Airport Services, Inc., an Illinois corporation doing business in Arizona, John Does I-X; Jane Does I-X; Black and White Corporations I-X; and ABC Partnerships I-X,<br><br>               Defendants. | No. _____<br><br>**NOTICE OF REMOVAL** |

**TO:** **Clerk of the United States District Court for the District of Arizona:**

      Please take notice that Defendant Prospect Airport Services, Inc., ("Prospect") hereby removes to this Court the state court action described below:

      1.     Petitioner is a defendant in a certain civil action commenced and now pending

in the Superior Court in Maricopa County, Arizona, entitled *Douglas Heir v. American Airlines Group, Inc., et al.,* Case No. CV2024-031048; a copy of the Complaint in this action is attached hereto as **Exhibit "A"** and incorporated herein by this reference.

2.     Plaintiff's Complaint alleges state law claims for negligence, gross negligence, negligence per se, negligent undertaking, negligent hiring, training, retention, and supervision, and punitive damages arising out of alleged injuries suffered on or after October 2022 stemming from a fall while boarding an airplane. Compl. ¶¶ 96-152.

3.     This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b).

4.     Service of the Summons and Complaint on Prospect occurred in the matter on November 11, 2024, Therefore, the deadline to file a notice of removal is December 11, 2024.

5.     As explained below, this case is now properly removed to this Court because Prospect has satisfied the procedural requirements for removal and this Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1332(a).

## VENUE

6.     Venue is proper in the United States District Court for the District of Arizona under 28 U.S.C. § 1441(a) because the District of Arizona includes the county and court in which Plaintiff filed this action.

## PROCEDRURAL REQUIREMENTS

7.     In accordance with 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being filed with the clerk for the Maricopa County Superior Court on this date, and a copy of this Notice of Removal is being served on all parties to this lawsuit on this date.

8.     As required by 28 U.S.C. § 1446(a), attached to this Notice of Removal as **Exhibit A** are true and correct copies of all the following processes, pleadings and orders available to Prospect from Maricopa County Superior Court.

## CONSENT TO REMOVAL

9.     As required by 28 U.S.C. § 1441(a), and based upon prior communication with counsel, Defendants American Airlines Group, Inc. consents to removal and will file notice of their consent after this Notice of Removal is filed.

10.     As required by 28 U.S.C. § 1441(a), and based upon prior communication with counsel, Defendants American Airlines, Inc. consents to removal and will file notice of their consent after this Notice of Removal is filed.

## BASIS FOR REMOVAL

11.     This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because (1) the amount in controversy exceeds $75,000, exclusive of interest and costs, and (2) the action is between citizens of different states. 28 U.S.C. §§ 1332(a), 1441(b); Compl. ¶¶ 1-4, 224.

12.     Accordingly, this case is properly removed under 28 U.S.C. § 1332 and 1441, as this case falls under the Court's diversity jurisdiction.

## AMOUNT IN CONTROVERSY

13.     Plaintiff's Complaint does not plead for a specific amount; however, upon information and belief, Plaintiff's alleged damages are in excess of $75,000.00 because Plaintiff pled this case as a Tier 3 case under Rule 26.2 of the Arizona Rules of Civil

Procedure, which generally governs "[a]ctions claiming $300,000 or more in damages…." Ariz.R.Civ.P. 26.2(c)(3)(C); *see also* Compl. ¶ 224.

## CITIZENSHIP

14.     For diversity purposes, "a corporation shall be deemed a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. §§ 1332(c)(1).

15.     Defendant Prospect was, and still is, a foreign corporation that conducts business in the State of Arizona. Prospect is incorporated under the laws of Delaware and its principal place of business is Illinois. Prospect is therefore a citizen of Delaware and Illinois under 28 U.S.C. § 1332(c)(1).

16.     Upon information and belief, Defendant American Airlines Group, Inc. was, and still is, a foreign corporation that conducts business in the State of Arizona. American Airlines Group, Inc. is incorporated under the laws of Delaware and its principle place of business is in Fort Worth, Texas. Prospect is therefore a citizen of Delaware and Texas under 28 U.S.C. § 1332(c)(1). Compl. ¶ 2.

17.     Upon information and belief, Defendant American Airlines, Inc. was, and still is, a foreign corporation that conducts business in the State of Arizona. American Airlines Group, Inc. is incorporated under the laws of Delaware and its principle place of business is Fort Worth, Texas. Prospect is therefore a citizen of Delaware and Texas under 28 U.S.C. § 1332(c)(1). Compl. ¶ 4.

18.     Plaintiff alleges in their Complaint that they are a resident of Camden County

in the State of New Jersey. Compl. ¶ 1.

## **CONCLUSION**

19.    Pursuant to 28 U.S.C. § 1332(a), this Court has jurisdiction over this action under 28 U.S.C. §§ 1441 and 1446 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and this is a civil action between citizens of different states.

20.    By filing this Notice of Removal, Prospect does not waive any defense or objection available to it under the law. Prospect reserves the right to amend or supplement this Notice of Removal.

21.    The undersigned has read this Notice of Removal and, to the best of the undersigned's knowledge, information and belief, formed after reasonable inquiry, certifies that Defendant's factual allegations have evidentiary support and its legal contentions are warranted by existing law.  The undersigned also certifies that this Notice of Removal is not presented for any improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation.

DATED this 11ᵗʰ day of December, 2024.

BROENING OBERG WOODS & WILSON, P.C.

By  */s/ Jeremiah M. Sullivan*
Jeremiah M. Sullivan
Robert T. Sullivan
2800 North Central Avenue, Suite 1600
Phoenix, Arizona 85004
*Attorneys for Defendant Prospect Airport Services, Inc.*

5

1

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of December, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Mark S. O'Connor, Esq.
Jennifer B. Anderson, Esq.
Alex Morris, Esq.
BEUS O'CONNOR McGRODER PLLC
701 North 44th Street
Phoenix, AZ 85008-6504
moconnor@bomlawgroup.com
janderson@bomlawgroup.com
amorris@bomlawgroup.com
*Attorneys for Plaintiff*

By */s/ Suzanne Beard*

# EXHIBIT A

*** Electronically Filed ***
C. Nasui, Deputy
10/30/2024 6:02:17 PM
Filing ID 18774851

Person Filing: Alex Morris
Address (if not protected): 701 N. 44th St.
City, State, Zip Code:  Phoenix, AZ 85008
Telephone: (480)429-3031
Email Address: amorris@bomlawgroup.com
Representing [□ ] Self or [☒ ] Attorney for:
Lawyer's Bar Number: 035239, Issuing State: AZ

# SUPERIOR COURT OF ARIZONA
## IN MARICOPA COUNTY

Case Number: **CV2024-031048**

Douglas Heir
_____
Name of Plaintiff

**SUMMONS**

AND

American Airlines Group, Inc., et al.
_____
Name of Defendant

> **WARNING**: This is an official document from the court that affects your rights. Read this carefully.
> If you do not understand it, contact a lawyer for help.

**FROM THE STATE OF ARIZONA TO:** Prospect Airport Services, Inc.
_____
Name of Defendant

1.  **A lawsuit has been filed against you.** A copy of the lawsuit and other court papers are served on you with this *"Summons"*.

2.  If you do not want a judgment or order taken against you without your input, you must file an *"Answer"* or a *"Response"* in writing with the court and pay the filing fee. If you do not file an *"Answer"* or *"Response"* the other party may be given the relief requested in his/her Petition or Complaint. To file your *"Answer"* or *"Response"* take, or send, the *"Answer"* or *"Response"* to Clerk of the Superior Court, or electronically file your Answer through one of Arizona's approved electronic filing systems at http://www.azcourts.gov/efilinginformation. Mail a copy of your *"Response"* or *"Answer"* to the other party at the address listed on the top of this Summons. Note: If you do not file electronically you will not have electronic access to the document in this case.

AZturboCourt.gov Form Set #10520359

Hand
delivered
11/11/24
given to Anne

3.   If this "Summons" and the other court papers were served on you by a registered process server or the Sheriff, within the State of Arizona, your "Response" or "Answer" must be filed within TWENTY (20) CALENDAR DAYS from the date you were served, not counting the day you were served.  If this "Summons" and the other papers were served on you by a registered process server or the Sheriff outside the State of Arizona, your Response must be filed within THIRTY (30) CALENDAR DAYS from the date you were served, not counting the day you were served. Service by a registered process server or the Sheriff is complete when made. Service by Publication is complete thirty (30) days after the date of the first publication.

4.   You can get a copy of the court papers filed in this case from the Petitioner at the address at the top of this paper, or from the Clerk of the Superior Court.

5.   Requests for reasonable accommodation for persons with disabilities must be made to the office of the judge or commissioner assigned to the case, at least ten (10) judicial days before your scheduled court date.

6.   Requests for an interpreter for persons with limited English proficiency must be made to the office of the judge or commissioner assigned to the case at least ten (10) judicial days in advance of your scheduled court date.

SIGNED AND SEALED this Date: *October 30, 2024*

*JEFF FINE*
Clerk of Superior Court

By: *C. NASUI*
Deputy Clerk



Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

If you would like legal advice from a lawyer, contact Lawyer Referral Service at 602-257-4434 or https://maricopabar.org. Sponsored by the Maricopa County Bar Association.

Clerk of the Superior Court
*** Electronically Filed ***
C. Nasui, Deputy
10/30/2024 6:02:17 PM
Filing ID 18774846

**BOM** | BEUS
O'CONNOR
McGRODER pllc

ATTORNEYS AT LAW
701 NORTH 44TH STREET
PHOENIX, ARIZONA 85008-6504
TELEPHONE (480) 429-3000

Mark S. O'Connor | 011029 | moconnor@bomlawgroup.com
Jennifer B. Anderson | 015605 | janderson@bomlawgroup.com
Alex Morris | 035239 | amorris@bomlawgroup.com
*Attorneys for Plaintiff*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| DOUGLAS HEIR, a single man,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN AIRLINES GROUP, INC., a Delaware corporation doing business in Arizona; AMERICAN AIRLINES, INC., a Delaware corporation doing business in Arizona; PROSPECT AIRPORT SERVICES, INC., an Illinois corporation doing business in Arizona; JOHN DOES I-X; JANE DOES I-X; BLACK AND WHITE CORPORATIONS I-X; and ABC PARTNERSHIPS I-X,<br><br>Defendants. | No. CV2024-031048<br><br>**COMPLAINT**<br><br>(Tort; Negligence; Negligence *Per Se*)<br><br>(Jury Trial Demanded) |

Plaintiff Douglas Heir, by and through counsel undersigned, and for his causes of action against Defendants, hereby asserts, avers, and alleges as follows:

## PARTIES

1.      At all times material to this Complaint, Plaintiff Douglas Heir (hereafter "Doug"), a single man, was a resident of Camden County in the State of New Jersey.

1447760

1    2.    Upon information and belief, Defendant American Airlines Group, Inc.

2  ("AAG") is a Delaware corporation, doing business in the State of Arizona, with its

3  principal place of business in Fort Worth, Texas.

4    3.    Plaintiff is informed and believes Defendant AAG has conducted business

5  throughout the State of Arizona on a systematic and continuous basis.

6    4.    Upon information and belief, American Airlines, Inc. ("American Airlines")

7  is a Delaware corporation doing business in the State of Arizona, with its principal place

8  of business in Fort Worth, Texas.

9    5.    Defendant American Airlines is a wholly-owned subsidiary of Defendant

10  AAG.

11    6.    Plaintiff is informed and believes Defendant American Airlines is and was

12  duly authorized to do business in the State of Arizona and has conducted business

13  throughout the State of Arizona on a systematic and continuous basis.

14    7.    Defendant American Airlines, through its operation of a hub at Phoenix Sky

15  Harbor International Airport and its customer relations office in Tempe, does business and

16  employees people in Maricopa County, Arizona.

17    8.    Defendant AAG exercises dominion and control over Defendant American

18  Airlines.

19    9.    Defendant AAG could reasonably anticipate being haled into Court in

20  Arizona based upon the substantial and continuous contacts Defendant American Airlines

21  has in the State of Arizona.

22    10.    Defendant AAG could further reasonably anticipate being haled into court

23  in Arizona based upon the substantial and continuous contacts its other wholly-owned

24  subsidiaries, such as Piedmont Airlines, Inc., have in the State of Arizona.

25

1447760

2

11.    Defendants AAG and American Airlines operate the largest airline in the world based on several metrics including fleet size, scheduled passenger miles flown per year, and airline company revenue.

12.    Defendant American Airlines operates as a major network air carrier, providing scheduled air transportation for both passengers and cargo through its hubs, including Phoenix and Philadelphia, as well as Dallas/Fort Worth, Chicago, Charlotte, and Miami.

13.    Defendants AAG and American Airlines operate this network with flights carried out by Defendant American Airlines being referred to as mainline operations, supported by regional flights operating under the name American Eagle. These regional operations are carried out by regional carriers that are wholly-owned subsidiaries of Defendant AAG as well as third-party regional carriers.

14.    The claims raised in this Complaint relate to mainline operations, which were directly carried out by Defendant American Airlines.

15.    Upon information and belief, Defendant Prospect Airport Services, Inc. ("Prospect") is an Illinois corporation doing business in the State of Arizona, with its principal place of business in Des Plaines, Illinois.

16.    Plaintiff is informed and believes Defendant Prospect has conducted business throughout the State of Arizona on a systematic and continuous basis, including providing wheelchair services at Phoenix Sky Harbor International Airport and at Tucson International Airport.

17.    Defendant Prospect could reasonably anticipate being haled into court in Arizona based upon the substantial and continuous contacts it has in the State of Arizona.

18.    Defendants John Does I-X, Jane Does I-X, Black and White Corporations I-X, and ABC Partnerships I-X are individuals, corporations, partnerships, or business

3

1447760

1    entities which caused the events complained of to occur in the State of Arizona. Plaintiff

2    does not know the true identities of said Defendants. Plaintiff will amend the Complaint

3    when the true names of these Defendants become known.

4        19.    All defendants are collectively known as "Defendants."

5        20.    At all times relevant to this Complaint, individuals employed by Defendant

6    AAG were acting within the course and scope of their employment and/or agency with

7    Defendant AAG. Defendant AAG is vicariously liable and responsible for actions,

8    omissions, and/or negligence on the part of such individuals in connection with acts and

9    conduct giving rise to this action, in accordance with the doctrine of *respondeat superior*

10   and/or principal/agency and/or non-delegable duty principles. This includes without

11   limitation any agent, ostensible or actual agent, or employee of Defendant AAG who

12   participated in any manner in the negligent conduct and omissions described herein.

13       21.    At all times relevant to this Complaint, individuals employed by Defendant

14   American Airlines were acting within the course and scope of their employment and/or

15   agency with Defendant American Airlines. Defendant American Airlines is vicariously

16   liable and responsible for actions, omissions, and/or negligence on the part of such

17   individuals in connection with acts and conduct giving rise to this action, in accordance

18   with the doctrine of *respondeat superior* and/or principal/agency and/or non-delegable

19   duty principles. This includes without limitation any agent, ostensible or actual agent, or

20   employee of Defendant American Airlines who participated in any manner in the negligent

21   conduct and omissions described herein.

22       22.    At all times relevant to this Complaint, individuals employed by Defendant

23   Prospect were acting within the course and scope of their employment and/or agency with

24   Defendant Prospect. Defendant Prospect is vicariously liable and responsible for actions,

25   omissions, and/or negligence on the part of such individuals in connection with acts and

4

conduct giving rise to this action, in accordance with the doctrine of *respondeat superior* and/or principal/agency and/or non-delegable duty principles. This includes without limitation any agent, ostensible or actual agent, or employee of Defendant Prospect who participated in any manner in the negligent conduct and omissions described herein.

23.    At all times relevant to this Complaint, Defendants AAG and American Airlines were and are liable for the negligence of its third party contractors, such as Defendant Prospect, when such negligence results in injury to a passenger. *See Ft. Lowell-NSS Ltd. P'ship v. Kelly,* 166 Ariz. 96, 103-04 (1990).

24.    At all times relevant to this Complaint, Defendants AAG and American Airlines owed non-delegable duties to provide reasonable care for the safety and welfare of their passengers who use wheelchairs in the boarding and deplaning process.

## **JURISDICTION AND VENUE**

25.    Plaintiff has suffered damages in an amount that exceeds the jurisdictional minimum of this Court.

26.    The acts and events hereinafter are alleged to have occurred in Maricopa County, Arizona.

27.    Defendants, and each of them, caused the events complained of herein to occur in Maricopa County, Arizona, out of which the allegations and causes of action set forth in this Complaint arise.

28.    This Court has jurisdiction to hear and enter a judgment in this matter pursuant to Ariz. Const. Art. 6, § 14, and A.R.S. § 12-123.

29.    Venue is proper in this Court pursuant to A.R.S. § 12-401.

1447760

**FACTUAL ALLEGATIONS**

A.   **Doug Heir is an Inspiring Figure Who Has Overcome Tremendous Challenges.**

30.    Doug is a highly decorated athlete who has overcome significant challenges in his life.

31.    At the age of 18 years old, Doug was working as a lifeguard at a local swimming pool in New Jersey.

32.    Doug observed a child that appeared to be drowning.  Without hesitation, Doug dove into the pool to rescue the child, and struck his head on the bottom of the pool.

33.    Doug's brother, Brian, was present and helped rescue Doug from the pool.

34.    Doug suffered a spinal cord injury at cervical level six (C6), experienced paralysis, and was diagnosed as a quadriplegic.

35.    As a result of his injuries, Doug also lost manual dexterity, fine motor skills, and effective control of his wrist.

36.    Following his injuries, Doug was depressed and thought his life had lost purpose.  In particular, Doug felt lost as athletics had been a major part of his life.

37.    Doug, with the help of his brother, Brian, began training to compete in athletic events.

38.    Doug's brother began by taping weights to Doug's hands and wrists to build his strength.

39.    At the one-year anniversary of his injuries, Doug was participating in track and field competitions.

40.    Doug went on to become one of the most decorated Paralympians in history.

41.    For many years, Doug travelled the globe, representing the United States at the Paralympic Games.

6

1447760

42.    Doug served as the captain of the Paralympic Track and Field Team at the 2000 Paralympic Games in Sydney, Australia.

43.    Doug participated in a variety of events, but focused primarily on shot put, javelin, discus, and the pentathlon, winning a host of gold and silver medals.

44.    Doug has won multiple medals and national championships.  He has also held various world records.

45.    Doug was featured on the cover of the box of Wheaties brand cereal.

46.    Doug appeared on numerous television programs and eventually became a motivational speaker, inspiring others to overcome challenges.

47.    Doug continued his education after his injury, obtaining a bachelor's degree, and then went on to earn a post-graduate degree.

48.    For four years, Doug served as President of the National Spinal Cord Injury Association.

49.    In May 2022, Doug was featured in CBS New York's "Snapshot New York" discussing his life story and his efforts, with his brother, Brian, to make a comeback in the world of sports through table tennis.

50.    More recently, Doug was the focus of a documentary released in December 2023 entitled "DOUG: The True Story of Doug Heir."  The documentary was produced and directed by Adam Ray, an actor and comedian.

51.    In connection with his athletic competitions, motivational speaking, and personal travel, Doug has taken countless flights and is an experienced flyer.

**B.**    **The Federal Government Has Enacted Laws and Promulgated Regulations to Protect the Rights of People that Use Wheelchairs When They Fly.**

52.    In 1986, Congress enacted the Air Carrier Access Act ("ACAA").

7

1447760

1       53.    The purpose of the ACAA is to prohibit "air carriers from discriminating against handicapped individuals in the provision of air transportation." S.Rept. 99-400, at 1.

54.    The ACCA provides that "[i]n providing air transportation, an air carrier … may not discriminate against an otherwise qualified individual on the following grounds: … the individual has a physical or mental impairment that substantially limits one or more major life activities[,] … the individual has a record of such an impairment[,] [or] … the individual is regarded as having such an impairment." 49 U.S.C. § 41705(a).

55.    The ACCA directed the Secretary of Transportation to promulgate regulations to ensure nondiscriminatory treatment of individuals with disabilities. Those regulations are currently found at 14 C.F.R. Part 382.

56.    Relevant to this case, 14 C.F.R. § 382.95 has the heading: "What are carriers' general obligations with respect to boarding and deplaning assistance?"

57.    That regulation provides: "[a]s a carrier, you must promptly provide or ensure the provision of assistance requested by or on behalf of passengers with a disability, or offered by carrier or airport operator personnel and accepted by passengers with a disability, in enplaning and deplaning. This assistance must include, as needed, the services of personnel and the use of ground wheelchairs, accessible motorized carts, boarding wheelchairs, and/or on-board wheelchairs where provided in accordance with this part, and ramps or mechanical lifts." 14 C.F.R. § 382.95(a).

58.    In addition, 49 U.S.C. § 41702 requires that "[a]n air carrier shall provide safe and adequate interstate air transportation."

8

1447760

C.    **American Airlines Claims They Provide "Accessible Travel."**

59.    The American Airlines website has a page for "Accessible Travel." That page states, "We're dedicated to providing a positive travel experience for all customers. You can request special assistance when booking your trip online or call us if you have special requests."

60.    The website also states that "American Airlines and American Eagle Reservations Offices maintain a staff of Special Assistance Coordinators (SACs) whose function is to make pre-travel arrangements for our customers with disabilities. They have been specifically trained to work with customers who have self-identified as having a disability and are requesting special assistance."

61.    American Airlines' website also states that "The Reservations representative who responds to the customer's initial call passes pertinent information to a SAC. They will then personally contact the customer to arrange their special needs and provide a toll-free number for follow up questions. This information is communicated to Airport and Flight Services personnel to ensure all American personnel are notified and prepared to fulfill the customer's request."

62.    The American Airlines website further states on its "Traveling with Mobility and Medical Devices" page that "If you're traveling with any medical device, a wheelchair or other mobility device we're here to help – we offer pre-boarding, deplaning and airport assistance."

63.    The American Airlines website states the following under "Boarding Assistance:" "If you have special needs, upon request, pre-boarding assistance will be provided to you, allowing you the opportunity to be seated prior to general boarding. A special aisle chair is available to assist you if you are unable to walk, and all of our jet

1447760

1    aircraft are equipped with specially designed seats that feature moveable aisle armrests to

2    help make seating easier."

3        64.    Based on these representations, a member of the traveling public, such as

4    Doug, would think American Airlines would be ready and able to assist passengers with

5    disabilities that used wheelchairs.

6        **D.**    **American Airlines Has a Troubled History of Providing Access and the Department of Transportation Has Levied Record Fines in the Amount of $50 Million.**

7

8        65.    On October 23, 2024, the Office of the Secretary of the U.S. Department of

9    Transportation entered a consent order against American Airlines in Docket Nos. OST-

10    2024-0001, OST-2024-0038, OST-2023-0158, and OST-2022-0075 ("Consent Order").

11        66.    The Consent Order concerned violations of the ACCA, 49 U.S.C. § 41705,

12    by American Airlines, as well as the ACCA's implementing regulations, 14 C.F.R. Part

13    382.

14        67.    The Consent Order also described violations of 49 U.S.C. § 41702, the

15    requirement to provide safe and adequate interstate air transportation; 49 U.S.C. § 41310,

16    the prohibition against unreasonable discrimination in foreign air transportation; and 49

17    U.S.C. § 41712, the prohibition against unfair and deceptive practices.

18        68.    The Department of Transportation assessed a civil penalty against American

19    Airlines in the amount of $50,000,000.

20        69.    This civil penalty is 25 times larger than any previous Department of

21    Transportation penalty against an airline for violating disability regulations.

22        70.    The Department of Transportation's investigation into American Airlines

23    revealed cases of unsafe physical assistance that at times resulted in injuries and

24    undignified treatment of wheelchair users.

25

10

1447760

71.     The investigation also revealed repeated failures to provide wheelchair assistance by American Airlines, as well as the airline's mishandling of thousands of wheelchairs by damaging them or delaying their return.

72.     The Department of Justice's Civil Rights Division assisted the Department of Transportation in the negotiation of the penalty.

73.     Assistant Attorney General for Civil Rights Kristen Clarke said, "We applaud the Department of Transportation's landmark civil rights agreement to uphold the dignity of passengers with disabilities in air travel.  The Department of Justice is committed to ensuring that people with disabilities have the freedom to travel independently. Travelers with disabilities must be confident they will receive timely assistance and arrive safely, with their mobility aids and assistive devices intact."

74.     Secretary of Transportation Pete Buttigieg said, "The era of tolerating poor treatment of airline passengers with disabilities is over.  With this penalty, we are setting a new standard of accountability for airlines that violate the civil rights of passengers with disabilities. By setting penalties at levels beyond a mere cost of doing business for airlines, we're aiming to change how the industry behaves and prevent these kinds of abuses from happening in the first place."

75.     The Department of Transportation's Office of Aviation Consumer Protection ("OACP") conducted the investigation into American Airlines.

76.     The OACP investigation was spurred, in part, by three formal complaints filed by the Paralyzed Veterans of America that alleged very similar experiences suffered by wheelchair users flying American Airlines from 2022 to 2023.

77.     The first complaint filed by the Paralyzed Veterans of America was assigned OACP Docket DOT-OST-2022-0075 and was filed on July 6, 2022.  This complaint

11

1447760

1    detailed the experiences of four individuals that are members of the Paralyzed Veterans of

2    America that were not provided adequate assistance from March to May 2022.

3        78.    The July 2022 complaint addressed numerous problems encountered by

4    these four individuals across American Airlines' network, including at Palm Beach

5    International Airport, Ronald Reagan Washington National Airport, Dallas/Fort Worth

6    International Airport, Indianapolis International Airport, Charlotte Douglas International

7    Airport, and Raleigh-Durham International Airport.

8        79.    The July 2022 complaint described the problems a flyer with disabilities had

9    at Ronald Reagan Washington National Airport on March 6, 2022. After landing, the flyer

10    was going to transfer from the aisle chair to his power wheelchair. "During the transfer

11    from the aisle chair to his power wheelchair, the AA wheelchair assistants set [name

12    redacted] on the end of his power wheelchair. His legs buckled underneath him and he

13    started to slide off the chair. He called for more people to help. An AA flight attendant

14    saved him from being dropped onto the floor, an incident that has happened in the past.

15    Due to the again unsafe transfer, [the flyer's] pants had embarrassingly been pulled down."

16    PVA Complaint, Docket DOT-OST-2022-0075, p. 4.

17        80.    The July 2022 complaint also included a different flyer's account of travel

18    in April 2022. The flyer experienced physical injury, humiliation, and discomfort at

19    Dallas/Fort Worth International Airport. PVA Complaint, Docket DOT-OST-2022-0075,

20    pp. 10-11.

21            On April 17, 2022, [name redacted] flew on American
    Airlines (AA) flight AA [redacted] from Richmond International

22        Airport (RIC) to Tulsa International Airport (TUL). [Name
    redacted] had a layover at Dallas Fort Worth International Airport

23        (DFW) for 1 hour and 20 minutes. [Name redacted] uses a
    wheelchair for his mobility disability. Upon landing at DFW, his

24        personal wheelchair was not available and AA personnel could not

25        locate it. A supervisor informed him that another passenger took his

12

wheelchair to their next gate and told him to transfer from the aisle chair to an airport push chair. AA wheelchair assistants transferred [name redacted] to a push chair, that [name redacted] could not push independently. Upon arriving to the gate, AA assistants abandoned [name redacted] in the push chair and the assistant left to help another passenger. He was left unattended in front of the gate for about 20-30 minutes.

[Name redacted] needed assistance to use the airport's restroom, but AA wheelchair assistants were not available to help. Left stranded, [name redacted] was unable to use the restroom in time and soiled himself. Eventually, his personal wheelchair arrived on a cart. An hour and 10 minutes lapsed from landing to the return of his chair. Due to the lengthy time spent in an inadequate deplaning device, [name redacted] developed a small pressure sore. He requested to speak with a manager, but no one ever came. The lack of proper assistance caused [name redacted] to experience physical pain, embarrassment, and discomfort.

81.     The second complaint filed by the Paralyzed Veterans of America was assigned OACP Docket DOT-OST-2023-0158 and was filed on October 13, 2023. The complaint detailed the experiences of an individual that is a member of Paralyzed Veterans of America as he traveled from Portland International Airport to Palm Beach International Airport, connecting through Dallas/Fort Worth International Airport.

82.     The October 2023 complaint detailed how American Airlines destroyed the wounded veteran's power wheelchair while it was in their custody: "the motor [was] pulled away from the frame on the left front, bending the frame; the rear trailing arms and casters were completely destroyed and needed to be replaced; the controller was significantly damaged; and the leg pivot lift was bent and needed to be completely destroyed." PVA Complaint, OACP Docket DOT-OST-2023-0158, p. 4.

83.     The third complaint filed by the Paralyzed Veterans of America was assigned OACP Docket DOT-OST-2024-0038 and was filed on March 14, 2024. The complaint detailed the experience of a person that has a role at the Christopher & Dana Reeve Foundation as she traveled from Ronald Reagan Washington National Airport to

13

1447760

1  Guanajuato International Airport, in Mexico, connecting through Dallas/Fort Worth

2  International Airport.

3      84.    The March 2024 complaint explained that at Ronald Reagan National

4  Airport, "AA personnel attempted to transfer [name redacted] from her personal

5  wheelchair to the aisle chair and from the aisle chair to her passenger seat. During this

6  transfer, AA personnel dropped [name redacted] onto the floor."

7      85.    The March 2024 complaint described how this woman was dropped two

8  additional times at Dallas/Fort Worth International Airport, and that these additional

9  events were video recorded.  PVA Complaint, OACP Docket DOT-OST-2024-0038, pp.

10  3-5.

11          In the video, on the jetbridge, one wheelchair attendant
       described how to use the aisle chair to another attendant who, per
12       the video evidence, was not trained to proficiency on the use of aisle
       chairs and aisle chair transfers. The video shows the wheelchair
13       attendants attempting to transfer [name redacted] from her personal
       wheelchair to the aisle chair. However, the wheelchair attendants
14       failed to properly strap [name redacted] to the aisle chair. During the
       unsuccessful transfer, one attendant exclaimed, "no, no, no," as
15       [name redacted] slid off the aisle chair onto the floor.

16          [Name redacted] began to cry exclaiming, "This is the second
       time I've been on the floor." Despite [name redacted] still laying on
17       the ground, the aisle chair attendant replied, "You'll be fine, you'll
       be fine, sorry." While the attendants were still trying to lift [name
18       redacted] from the ground, another passenger came down the
       jetbridge to board. The unknown passenger and companion held the
19       back of the aisle chair while AA personnel lifted [name redacted]
       from the ground onto the aisle chair. The unknown passenger then
20       maneuvered around [name redacted] and personnel as the attendants
       tried to use the straps of the aisle chair. One attendant repeated,
21       "This is no good, this is no good." Instead of strapping [her] legs to
       the aisle chair, they lifted her legs into the air, and held them up with
22       their hands as they maneuvered her onto the aircraft.

23          The attendants maneuvered [name redacted] in the aisle chair
       in the sight of rows of passengers and between passengers
24       continuing to board, creating additional safety risks for both [name

25

14

redacted] and other passengers. The passengers watched and some had to lean their bodies out of the aircraft aisle so the attendants could maneuver the aisle chair to [her] passenger seat. The unknown passengers stared at the attendants and [name redacted]. Their faces showed various expressions as they watched [name redacted] experience of the attendants attempting to transfer [her] from the aisle chair to her passenger seat. Since this experience occurred in the view of other passengers, it magnified the loss of dignity for [name redacted].

While [name redacted] was still in the aisle chair, passengers watched and some stood in the aisle behind her and the attendants. [Name redacted] then slid off the aisle chair and an attendant exclaimed, "She's going down, she's going down." One aisle chair attendant continued to instruct the others on when, how, and where to hold [name redacted] so she would not fall out of the aisle chair. But, again, [name redacted] ended up on the floor. After being dropped a second time at DFW, the attendants transferred [her] to her aircraft seat.

86.    In addition to the complaints filed by the Paralyzed Veterans of America, the OACP also looked at consumer complaints filed with the Department of Transportation filed between January 1, 2019, and December 31, 2023, that alleged inadequate wheelchair assistance provided to individuals with disabilities, as well as a small set of consumer complaints filed with American Airlines from the same timeframe regarding inadequate boarding, deplaning, or connecting assistance.

87.    OACP conducted its investigation and determined there were "a significant number of violations of [14 C.F.R. §§] 382.91, 382.95, and 382.141 for failing to provide individuals who use wheelchairs adequate enplaning and deplaning assistance, and assistance in moving within the terminal and connecting assistance." Consent Order, p. 3.

88.    "OACP found three categories of violations: cases of unsafe physical assistance provided to wheelchair users, including assistance that resulted in direct harm or injury to the passenger; cases of undignified assistance provided to wheelchair users;

15

1447760

1    and other cases that primarily concerned lack of prompt wheelchair assistance." Consent

2    Order, pp. 3-4 (footnotes omitted).

3        89.    OACP considered "unsafe physical assistance" "to include instances of

4    dropping passengers or rough handling of passengers by airline personnel when

5    transferring passengers to and from wheelchairs and aisle chairs, bumping passengers into

6    seats, walls, people, and other objects during assistance, improperly using aisle chairs,

7    including failing to properly strap in passengers and tipping over aisle chairs, and hand

8    carrying passengers on to or off the aircraft without the use of a wheelchair." Consent

9    Order, p. 3, n. 6.

10        90.    OACP considered "undignified assistance" "to include instances of

11    improper transfer assistance that disrobed passengers and wheelchair assistance failures

12    and extreme delays that resulted in passengers soiling themselves due to the inability to

13    access a rest room." Consent Order, p. 4, n. 7.

14        91.    OACP's investigation also revealed numerous regulatory violations related

15    to American Airlines' failure to return passengers' wheelchairs in a timely manner after

16    deplaning and "failing to return the wheelchairs in the condition in which they were

17    received." Consent Order, p. 4.

18        92.    The Consent Order notes that "[d]ue to the nature and breadth of American's

19    Part 382 violations, OACP has determined that enforcement action is warranted." Consent

20    Order, p. 4.

21        93.    American Airlines did not admit to the violations alleged in the Consent

22    Order but consented to "the issuance of [the Consent Order] to cease and desist from future

23    violations of the ACAA and 14 CFR Part 382 and to the assessment of $50,000,000 in

24    compromise of potential civil penalties otherwise due and payable pursuant to 49 U.S.C.

25    § 46301." Consent Order, p. 7.

16

1447760

94.    The OACP made a number of findings in the Consent Order.  Consent Order, p. 7-8.

We find that American Airlines, Inc., violated 14 CFR 382.95 by failing to provide prompt assistance to passengers with a disability in enplaning and deplaning the aircraft.

We find that American Airlines, Inc., violated 14 CFR 382.91 by failing to provide adequate assistance to passengers with a disability in moving within the terminal and in transportation between gates to make a connection.

We find that American Airlines, Inc., violated 14 CFR 382.125 by failing to provide for the timely return of wheelchairs and scooters as close as possible to the door of the aircraft, so that passengers may use their own equipment to the extent possible and ensure that passengers' wheelchairs and scooters are among the first items retrieved from the baggage compartment.

We find that American Airlines, Inc., violated 14 CFR 382.129 by failing to return wheelchairs and scooters to the passenger in the condition in which they were received.

We find that American Airlines, Inc., violated 14 CFR 382.141 by failing to ensure proficient training to its personnel and contractors concerning the requirements of Part 382, the carrier's procedures concerning the provision of air travel to passengers with disabilities, and for those personnel involved in providing boarding and deplaning assistance, the use of the boarding and deplaning assistance equipment used by the carrier and appropriate boarding and deplaning assistance procedures that safeguard the safety and dignity of passengers.

We find that by engaging in the conduct described ... above, American Airlines, Inc., violated 49 U.S.C. § 41705.

We find that to the extent the conduct described ... above, occurred in interstate air transportation and foreign air transportation, American Airlines, Inc., violated 49 U.S.C. §§ 41702 and 41310, respectively.

We find that by engaging in the conduct described ... above, American Airlines, Inc., engaged in unfair practices and thereby violated 49 U.S.C. § 41712.

95.    The Department of Transportation entered a cease and desist order in connection with these violations: "We order American Airlines, Inc., its successors, its affiliates, and all other entities owned by, controlled by, or under common ownership and

17

1447760

control with American Airlines, Inc., its successors, its affiliates, and its assigns to cease and desist from further violations of 49 U.S.C. §§ 41705, 41310, 41702, and 41712 and 14 CFR Part 382." Consent Order, p. 8.

**E.     Doug Sustained Physical Injuries and Underwent Surgeries on October 31, 2022 as a Result of Defendants' Negligence.**

96.     In late October 2022, Doug traveled from New Jersey to Arizona to celebrate the wedding of his friend, Adam Ray, who had produced a documentary about Doug's life.

97.     Doug's flight to Arizona with Defendant American Airlines took place without incident.

98.     In preparation for his flight to Philadelphia, Doug had advised American Airlines that he would require assistance.

99.     Specifically, Doug had self-identified as a passenger who did not have balance as a result of a neck injury.

100.     Doug was scheduled to fly from Phoenix to Philadelphia on American Airlines Flight No. 817.

101.     Doug was flying first class on his flight to Philadelphia.

102.     Doug arrived at the airport in Phoenix and traveled to the ticket counter in his power chair.

103.     At the ticket counter, Doug reiterated his assistance needs.

104.     Doug then went through security and reported to his gate.

105.     Once he arrived at the gate, Doug immediately went to the counter to let the agent know that he planned to participate in preboarding and that he would need assistance boarding.     Doug reiterated the information he had previously shared with Defendant American Airlines.

18

1447760

106. Eventually, the preboarding process started and Doug traveled down the jet bridge in his power chair.

107. Doug was accompanied by two individuals, a man and a woman, who were there to provide assistance to Doug on behalf of American Airlines.

108. Upon information and belief, at least one of the individuals was an employee or agent of Defendant Prospect.

109. Regardless of their employment, all individuals that were there to assist Doug were acting at the direction of Defendants American Airlines and AAG, and were acting in furtherance of the business of American Airlines and AAG and within the course and scope of their employment, and/or agency, apparent or ostensible, with American Airlines and AAG.

110. Defendants had a duty to ensure that any and all persons employed to assist disabled passengers with the boarding process were properly trained and qualified to provide assistance.

111. While Doug was seated in his power chair, the aisle chair was placed to Doug's right side, adjacent to the power chair.

112. Doug briefed the individuals that were to assist him. Doug indicated that he had no balance, and that Doug would lift himself and begin the transfer and that the individuals aiding Doug would need to spot Doug and assist with balance and support.

113. The individuals aiding Doug did not object to this procedure.

114. Doug then flipped up the right armrest of his power chair and began the transfer.

115. The individuals providing assistance to Doug were in close proximity to Doug, about 18 inches, when Doug began the transfer.

1447760

1      116.    At no point after Doug initiated the transfer did the individuals providing

2  assistance ask Doug to stop or wait.

3      117.    After Doug initiated the transfer, the individuals providing assistance did

4  not assist, hold, or spot Doug.

5      118.    As a result, Doug began to lose his balance, and he requested assistance,

6  exclaiming "Grab me!" repeatedly.

7      119.    The individuals providing assistance were negligent in assisting, holding,

8  and spotting Doug, causing him to fall to the ground of the jet bridge and land hard on his

9  left buttock, resulting in physical injury.

10      120.    As a result of the positioning of his body, Doug was unable to break his fall

11  with his hands.

12      121.    The force of the fall caused Doug to sustain an abrasion or laceration on his

13  left buttock. Given his quadriplegia, Doug was unaware of the laceration until after he

14  returned to New Jersey.

15      122.    Persons that have suffered from spinal cord injuries, such as Doug, are at an

16  increased risk of broken skin from abrasions, lacerations, or skin erosions evolving into

17  serious wounds or ulcers.

18      123.    People with spinal cord injuries are at a greater risk of developing serious

19  wounds or ulcers due to decreased sensation, lack of movement, and sustained sitting.

20      124.    In addition, people with spinal cord injuries are often more susceptible to

21  injuries to the buttocks in the event of a fall, because they have reduced muscle mass in

22  the buttocks due to lack of mobility associated with the spinal cord injury.

23      125.    Such a lack of muscle mass makes the impact of a fall more severe.

24      126.    Doug is susceptible to injury on his buttocks from a fall.

25

1447760

127.    As a result of his spinal cord injury, Doug has less muscle mass on his buttocks, potentially amplifying the impact of any fall.

128.    As a person who suffers from quadriplegia, Doug is more susceptible to broken skin developing into a serious wound or ulcer.

129.    As a person who suffers from quadriplegia, Doug is more susceptible to wounds or ulcers that either heal slowly or not at all.

130.    Doug is more susceptible to injury than a normally healthy person would have been.

131.    As a result of Defendants' negligence, Doug sustained an open wound, which led to a serious wound or ulcer that necessitated multiple surgeries to treat.

132.    Unfortunately, the force of the fall on the jet bridge caused Doug to defecate into his clothing.

133.    After falling to the ground, Doug requested assistance getting into the aisle chair, and Defendants' employees and agents refused to provide assistance.

134.    Upon information and belief, emergency services were called and after approximately 20 to 30 minutes, Doug was placed into the aisle chair and took his seat in the plane.

135.    The boarding process for Flight No. 817 was delayed for all passengers due to Defendants' negligence and the associated delay in getting Doug on board.

136.    As the other passengers streamed onboard, they stared at Doug, who had just defecated into his clothing.

137.    Upon information and belief, the other passengers surmised that the delays in boarding were related to Doug.

138.    This experience was embarrassing and humiliating for Doug.

1447760

1    139.    Doug sat for the rest of the flight in his waste with an open wound. Doug

2    was unable to clean himself until he returned to his home in New Jersey, hours later.

3    140.    Within a week of his injury Doug was seen in his home by a relative who is

4    a physician, Dr. David Rosen.

5    141.    Doug first saw Dr. Rosen on November 5, 2022, and a small laceration was

6    observed in Doug's left buttocks.

7    142.    Doug was seen by Dr. Rosen again over the next several months until Dr.

8    Rosen recommended Doug see a wound care specialist.

9    143.    Doug then initiated care with a wound care specialist.

10    144.    Throughout 2023, the wound did not improve, despite consistent medical

11    care and treatment.

12    145.    As a result of his injury, Doug has suffered from infections and other

13    complications.

14    146.    Doug had a CT scan conducted on December 5, 2023, which showed

15    probable osteomyelitis.

16    147.    Doug underwent a biopsy of the left ischial bone on February 16, 2024,

17    which was negative for osteomyelitis.

18    148.    On September 18, 2024, Doug underwent skin flap surgery at the University

19    of Pennsylvania Hospital in Philadelphia.

20    149.    The surgery involved removing tissue from Doug's left buttock and then

21    surgically shifting healthy tissue to cover the wound site.

22    150.    The skin flap surgery involved significant cutting of skin and will result in

23    substantial scarring.

24    151.    Doug is currently on bed rest, recovering from the surgery.

25

22

1447760

1   152.   Doug has suffered substantial pain and discomfort as a result of the injuries

2   he sustained on the jet bridge.

3   **COUNT ONE – NEGLIGENCE AND GROSS NEGLIGENCE**

4   153.   Plaintiff incorporates by reference all previous allegations in this Complaint.

5   154.   Defendants, and each of them, had a special relationship with Plaintiff.

6   155.   Defendants AAG and American Airlines operate an airline, and common

7   carriers have long been deemed to have a special relationship with their passengers.

8   156.   A common carrier has a duty to transport its passengers in safety.

9   157.   This duty of a common carrier is non-delegable, meaning that the common

10  carrier retains responsibility for this duty, despite proper delegation to another, such as a

11  contractor. *Dixie State Lines v. Anderson,* 222 Ala. 673 (1931); *Ft. Lowell-NSS Ltd.*

12  *P'ship v. Kelly,* 166 Ariz. 96, 101 (1990).

13  158.   In addition, "[p]ublic policy may support the recognition of a duty of care."

14  *Gipson v. Kasey,* 214 Ariz. 141, 146 (2007). *Gilstrap v. United Airlines, Inc.,* 709 F.3d

15  995, 1004-1007 (9th Cir. 2013) holds that an airline carrier's duties are defined by the

16  ACAA and its accompanying regulations for state law claims. The ACAA and its

17  accompanying regulations reflect a public policy that airlines must not discriminate

18  against disabled passengers, and specifically, that they must provide or ensure the

19  provision of assistance to disabled passengers in enplaning and deplaning. This public

20  policy gives rise to a duty under Arizona law.

21  159.   As detailed above, Defendants had a duty to assist Plaintiff in the boarding

22  process.

23  160.   These duties, as defined at 14 C.F.R. § 382.95(a), include "promptly

24  provid[ing]" "assistance requested by or on behalf of passengers with a disability" "in

25  enplaning."

23

1447760

161.    Defendants breached their duties to Plaintiff by failing to render assistance when Plaintiff began transitioning from his power chair to the aisle chair.

162.    Defendants further breached their duties to Plaintiff by failing to provide support and balance assistance when he began to fall and exclaimed repeatedly "Grab me!"

163.    Defendants negligently assisted, held, and spotted Doug, causing him to fall and sustain physical injuries, including an abrasion or laceration which developed into a serious wound.

164.    As a quadriplegic, Doug was unusually susceptible to sustaining difficult-to-treat wounds.

165.    Eventually, Doug's wound required multiple surgical interventions.

166.    Defendants knew or should have known of the significant risk of fall posed to Plaintiff.

167.    As a direct and proximate result of the negligence of Defendants, Doug was seriously injured on October 31, 2022, resulting in serious medical complications that continue to the present day.

168.    As a direct and proximate result of Defendants' negligence, Doug has suffered dignitary harm, including humiliation, embarrassment, and discomfort.

169.    As a direct and proximate result of Defendants' negligent, careless, and reckless acts and omissions, Doug has experienced pain, discomfort, suffering, disability, disfigurement, and anxiety which are all reasonably probable to be experienced in the future.

170.    As a direct and proximate result of Defendants' negligent, careless, and reckless acts and omissions, Doug has incurred medical bills and related expenses and will continue to incur expenses in the future in an amount presently unknown.

1447760

171. As a direct and proximate result of Defendants' negligent, careless, and reckless acts and omissions, Doug lost time from his employment and has suffered a loss of earnings both past and into the future.

172. As a further direct and proximate result of Defendants' negligent, careless, and reckless acts and omissions, Doug sustained a loss of enjoyment of life and diminished ability to participate in life's activities to the quality and extent he normally enjoyed before the injury.

## COUNT TWO – NEGLIGENCE *PER SE*

173. Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

174. Defendants AAG and American Airlines breached the Air Carrier Access Act or ACAA, 49 U.S.C. § 41705, which prohibits discrimination against individuals with disabilities in air transportation.

175. Defendants AAG and American Airlines also violated the regulations implementing the ACAA, 14 C.F.R. Part 382.

176. These laws and regulations required AAG and American Airlines to provide Doug with adequate boarding assistance.

177. Defendants further violated 49 U.S.C. § 41702 (requiring Defendants AAG and American Airlines to provide safe and adequate interstate air transportation).

178. The statutes and regulations breached by Defendants in this case were designed for the protection and safety of persons in Plaintiff's position.

179. Defendants' breach of these statutes and regulations constitutes negligence *per se*.

180. As a direct and proximate result of Defendants' negligence, Doug has suffered dignitary harm, including humiliation, embarrassment, and discomfort.

25

1447760

181.    As a direct and proximate result of Defendants' negligent, careless, and reckless acts and omissions, Doug has experienced pain, discomfort, suffering, disability, disfigurement, and anxiety which are all reasonably probable to be experienced in the future.

182.    As a direct and proximate result of Defendants' negligent, careless, and reckless acts and omissions, Doug has incurred medical bills and related expenses and will continue to incur expenses in the future in an amount presently unknown.

183.    As a direct and proximate result of Defendants' negligent, careless, and reckless acts and omissions, Doug lost time from his employment and has suffered a loss of earnings both past and into the future.

184.    As a further direct and proximate result of Defendants' negligent, careless, and reckless acts and omissions, Doug sustained a loss of enjoyment of life and diminished ability to participate in life's activities to the quality and extent he normally enjoyed before the injury.

**COUNT THREE – NEGLIGENT UNDERTAKING**

185.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

186.    Defendants had a duty to use due care, as well as a duty to safely assist passengers using wheelchairs in the boarding and deplaning process.

187.    Upon information and belief, Defendants AAG and American Airlines operated a training, safety, and compliance program to ensure the safety of passengers using wheelchairs in the boarding and deplaning process.

188.    Defendants AAG and American Airlines undertook the duty to ensure the safe boarding and deplaning of passengers that use wheelchairs.

1447760

189.  Upon information and belief, Defendant Prospect operated a training, safety, and compliance program to ensure the safety of passengers using wheelchairs in the boarding and deplaning process.

190.  Defendant Prospect undertook the duty to ensure the safe boarding and deplaning of passengers that use wheelchairs.

191.  Defendants each knew or should have known that their respective training, safety, and compliance programs were intended to protect airline passengers that use wheelchairs.

192.  Upon information and belief, Defendants each failed to properly design and implement their respective training, safety, and compliance programs.

193.  Upon information and belief, Defendants each failed to exercise reasonable care regarding the manner in which they implemented their respective safety programs and sought to safely assist passengers in the boarding and deplaning process.

194.  Defendants each affirmatively and voluntarily undertook responsibility that airline passengers using wheelchairs could safely board and deplane from aircraft.

195.  Defendants have each, therefore, voluntarily assumed a duty to ensure the safety of passengers using wheelchairs in the boarding and deplaning process.

196.  Defendants' failure to exercise reasonable care and adequately implement their respective training, safety, and compliance programs increased the risk of harm to Plaintiff.

197.  Defendants undertook a duty to assist in the safe boarding and deplaning of disabled passengers. After undertaking that duty, Defendants had an obligation to carry out that duty and perform any necessary tasks to assist passengers safely board and deplane.

27

1447760

198.    Defendants' failures to exercise reasonable care regarding their respective training, safety, and compliance programs were each a substantial factor in causing harm to Plaintiff.

199.    Defendants negligently assisted, held, and spotted Doug, causing him to fall and sustain physical injuries, including an abrasion or laceration which developed into a serious wound.

200.    As a quadriplegic, Doug was unusually susceptible to sustaining difficult-to-treat wounds.

201.    Eventually, Doug's wound required multiple surgical interventions.

202.    As a direct and proximate result of Defendants' negligence, Doug has suffered dignitary harm, including humiliation, embarrassment, and discomfort.

203.    As a direct and proximate result of Defendants' negligent, careless, and reckless acts and omissions, Doug has experienced pain, discomfort, suffering, disability, disfigurement, and anxiety which are all reasonably probable to be experienced in the future.

204.    As a direct and proximate result of Defendants' negligent, careless, and reckless acts and omissions, Doug has incurred medical bills and related expenses and will continue to incur expenses in the future in an amount presently unknown.

205.    As a direct and proximate result of Defendants' negligent, careless, and reckless acts and omissions, Doug lost time from his employment and has suffered a loss of earnings both past and into the future.

206.    As a further direct and proximate result of Defendants' negligent, careless, and reckless acts and omissions, Doug sustained a loss of enjoyment of life and diminished ability to participate in life's activities to the quality and extent he normally enjoyed before the injury.

1447760

## COUNT FOUR – NEGLIGENT HIRING, TRAINING, RETENTION, AND SUPERVISION

207.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

208.    Employers have a duty to conduct adequate due diligence when hiring employees.

209.    Employers have a duty to properly train employees to adequately perform their job duties.

210.    Employers also have duties to not retain employees or contracted employees that put others in danger or that violate workplace rules, policies, and procedures.

211.    Employers also have duties to properly supervise employees or contracted employees.

212.    Defendants were negligent in the hiring, training, retention, and supervision of their employees or contracted employees that were assigned to assist Doug in boarding his flight in Phoenix on October 31, 2022.

213.    Defendants were negligent in failing to promulgate and enforce policies, procedures, and maintenance programs designed to protect passengers that used wheelchairs, including Doug.

214.    Defendants' negligence in hiring, training, retention, and supervision of employees or contracted employees that proximately caused Doug's injuries and damages.

215.    As a direct and proximate result of Defendants' negligence, Doug has suffered dignitary harm, including humiliation, embarrassment, and discomfort.

216.    As a direct and proximate result of Defendants' negligent, careless, and reckless acts and omissions, Doug has experienced pain, discomfort, suffering, disability,

29

1447760

1  disfigurement, and anxiety which are all reasonably probable to be experienced in the

2  future.

3      217.  As a direct and proximate result of Defendants' negligent, careless, and

4  reckless acts and omissions, Doug has incurred medical bills and related expenses and will

5  continue to incur expenses in the future in an amount presently unknown.

6      218.  As a direct and proximate result of Defendants' negligent, careless, and

7  reckless acts and omissions, Doug lost time from his employment and has suffered a loss

8  of earnings both past and into the future.

9      219.  As a further direct and proximate result of Defendants' negligent, careless,

10  and reckless acts and omissions, Doug sustained a loss of enjoyment of life and diminished

11  ability to participate in life's activities to the quality and extent he normally enjoyed before

12  the injury.

13  **COUNT FIVE – PUNITIVE DAMAGES**

14      220.  Plaintiff incorporates by reference each of the preceding paragraphs as

15  though fully set forth herein.

16      221.  Defendants' conduct was outrageous, oppressive, and intolerable and

17  created a substantial risk of tremendous harm to Doug.

18      222.  Defendants' conduct demonstrated their conscious and deliberate disregard

19  for the rights and interests of others.

20      223.  Plaintiff is entitled to an award of punitive damages and exemplary damages

21  based upon Defendants' intentional, willful, wanton, reckless, and malicious behavior

22  and/or conscious disregard of the substantial risk that such conduct might significantly

23  injure Doug.

24

25

1447760

**RULE 26.2 TIER ALLEGATION**

224.    Due to the severe negligent conduct of Defendants, and the losses experienced by Doug, Doug is entitled to damages at a Tier 3 level within the criteria of Rule 26.2(c)(3)(C) and (b)(3).

**DEMAND FOR JURY TRIAL**

225.    Plaintiff hereby demands a trial by jury in this matter.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.    For Plaintiff's general damages in an amount deemed fair and reasonable by a jury which would fully and fairly compensate Plaintiff for his injuries and damages, including pain, discomfort, suffering, disability, anxiety, loss of enjoyment of life, and permanency of injuries, but in any event well in excess of the minimum jurisdictional limits of this Court;

2.    For past, future, and special damages in an amount to be proven at trial, including but not limited to medical treatment, care, expenses, and other economic and pecuniary harm and losses;

3.    For Plaintiff's damages suffered from dignitary harm, including humiliation, embarrassment, and discomfort;

4.    For the value of Doug's lost income;

5.    For the value of Doug's lost earning capacity;

6.    For an award of attorneys' fees;

7.    For pre-judgment and post-judgment interest at the highest legal rate;

8.    For all costs incurred herein; and

9.    For such other and further relief as the Court and jury deem just and proper.

31

1447760

1    DATED this 30th day October 2024.

2                                    **BEUS O'CONNOR MCGRODER** PLLC

3                                    By */s/ Alex Morris*
4                                           Mark S. O'Connor
                                            Jennifer B. Anderson
5                                           Alex Morris
                                            701 North 44th Street
6                                           Phoenix, Arizona 85008-6504
                                            *Attorneys for Plaintiff*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1447760

32

Clerk of the Superior Court
*** Electronically Filed ***
C. Nasui, Deputy
10/30/2024 6:02:17 PM
Filing ID 18774848

Person/Attorney Filing: Alex Morris
Mailing Address: 701 N. 44th St.
City, State, Zip Code: Phoenix, AZ 85008
Phone Number: (480)429-3031
E-Mail Address: amorris@bomlawgroup.com
[ ☐ ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 035239, Issuing State: AZ

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

Douglas Heir
Plaintiff(s),
v.
American Airlines Group, Inc., et al.
Defendant(s).

Case No. **CV2024-031048**

**CERTIFICATE OF COMPULSORY ARBITRATION**

I certify that I am aware of the dollar limits and any other limitations set forth by the Local Rules of Practice for the Maricopa County Superior Court, and I further certify that this case IS NOT subject to compulsory arbitration, as provided by Rules 72 through 77 of the Arizona Rules of Civil Procedure.

RESPECTFULLY SUBMITTED this October 30, 2024

By: Alex Morris /s/
Plaintiff/Attorney for Plaintiff

AZturboCourt.gov Form Set #10520859

« Return to search results

## Case Information

| | | | |
|---|---|---|---|
| **Case Number:** | CV2024-031048 | **Judge:** | Viola, Danielle |
| **File Date:** | 10/30/2024 | **Location:** | Downtown |
| **Case Type:** | Civil | | |

## Party Information

| Party Name | Relationship | Sex | Attorney |
|---|---|---|---|
| Douglas Heir | Plaintiff | Male | Alexander Morris |
| American Airlines Group Inc | Defendant | | Pro Per |
| American Airlines Inc | Defendant | | Pro Per |
| Prospect Airport Services Inc | Defendant | | Pro Per |

## Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 11/12/2024 | AFS - Affidavit Of Service | 11/15/2024 | |
| **NOTE:** | PROSPECT AIRPORT SERVICES INC | | |
| 11/12/2024 | AFS - Affidavit Of Service | 11/15/2024 | |
| **NOTE:** | AMERICAN AIRLINE GROUP INC | | |
| 11/12/2024 | AFS - Affidavit Of Service | 11/15/2024 | |
| **NOTE:** | AMERICAN AIRLINES INC | | |
| 10/30/2024 | COM - Complaint | 10/31/2024 | |
| **NOTE:** | Complaint | | |
| 10/30/2024 | CSH - Coversheet | 10/31/2024 | |
| **NOTE:** | Civil Cover Sheet | | |
| 10/30/2024 | CCN - Cert Arbitration - Not Subject | 10/31/2024 | |
| **NOTE:** | Certificate Of Compulsory Arbitration - Is Not Subject To | | |
| 10/30/2024 | SUM - Summons | 10/31/2024 | |
| **NOTE:** | Summons | | |
| 10/30/2024 | SUM - Summons | 10/31/2024 | |
| **NOTE:** | Summons | | |
| 10/30/2024 | SUM - Summons | 10/31/2024 | |
| **NOTE:** | Summons | | |

## Case Calendar

**There are no calendar events on file**

## Judgments

| Date | (F)or / (A)gainst | Amount | Frequency | Type | Status |
|---|---|---|---|---|---|
| **No records found.** | | | | | |